## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BRUCE M. SKOORKA,

        Plaintiff,

vs.

KEAN UNIVERSITY et al.,

        Defendants.

Civ. No. 2:16-cv-3842-KM-MAH

OPINION

**KEVIN MCNULTY, U.S.D.J.:**

Dr. Bruce M. Skoorka is a tenured professor of Economics and Finance at Kean University. He has frequently complained of discrimination and wrongful conduct by Kean University and persons affiliated with Kean. In this current action, Dr. Skoorka alleges that Kean University, his union, and persons affiliated with these entities have retaliated against him for whistleblowing and because of his religion. Now before the Court are defendants' motions to dismiss the complaint.

Because the allegations both repeat and supplement those made in prior actions and earlier in this action, this opinion should be read in conjunction with the Court's comprehensive opinion largely granting a prior motion for summary judgment. *See Skoorka v. Kean Univ.*, No. 9-cv-3428, 2017 WL 2838459 (D.N.J. June 30, 2017).

## I.    PROCEDURAL HISTORY[1]

Dr. Bruce Skoorka, a professor at Kean University, alleges that he has been subject to retaliation for whistleblowing and because of his religion. (Compl. ¶ 2). Dr. Skoorka identifies himself as a member of the Jewish faith. (Compl. ¶ 25). Dr. Skoorka sues Kean University, the State of New Jersey, the Board of Trustees of Kean University, Kean Federation of Teachers ("KFT"), American Federation of Teachers ("AFT"), and the Council of New Jersey State College Locals ("Council"). (Compl. ¶¶ 3-10). He also sues several individuals associated with Kean: Dawood Farahi (the President of Kean), Jeffrey Toney (Provost and Vice President for Academic Affairs), Suzanne Bousquet (Dean), Joy Moskovitz (Assistant Vice President for Academic Affairs), Kenneth Green (Counsel), Pamela Mosley Gresham (Ethics Liaison Officer), Sophia Howlett (Acting Dean and Director Associate Vice President for Learning Support), Faroque Chowdhury (Human Resources Director), and Charlie Williams (Title IX Coordinator, Director of Affirmative Action Programs). (Compl. ¶¶ 11-13).

### A. Prior Complaints and Lawsuits

Dr. Skoorka began working for Kean in 1996. *Skoorka v. Kean Univ.*, No. 9-3428, 2015 WL 3533878, at *1 (D.N.J. June 2, 2015). He was awarded tenure effective as of the 2001-02 academic year. *Id.* Over the course of his employment, he has lodged a number of complaints, some of which are surveyed here.

### i. Early internal complaints

Sometime before 1998, Dr. Skoorka complained internally that the then-chairperson of his department, Dr. Kempey, had discriminated against an

---

[1]    All facts and inferences are made in favor of the nonmoving party on a motion to dismiss. Citations to the complaint (ECF No. 1) are abbreviated as "Compl."

Pro se pleadings, as always, are liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106-07 (1976). Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citations omitted).

African American colleague on the basis of race. *Id.* He later reported that the University discriminated against him as a Jewish person. *Id.* He also made internal allegations that defendant Kempey was misappropriating funds from the Economics Department for personal use. *Id.* These embezzlement allegations were based solely on his observation that the department lacked office supplies, copiers, printers, or secretarial support. *Id.*

### ii. 2001 state court action

In November 2001, Dr. Skoorka brought a state court action against Kean, his union, and several individual defendants. *Id.* at *2. He alleged retaliation and discrimination on the basis of religion. *Id.* He pursued claims under the First Amendment, Equal Protection Clause, the Conscientious Employee Protection Act ("CEPA"), the New Jersey Law Against Discrimination ("NJLAD"), Title VII of the Civil Rights Act ("Title VII"), and Section 1983. *Id.*

The suit took some ten years, two jury trials, and at least two written opinions from the Appellate Division to fully resolve itself—although the Appellate Division observed that Dr. Skoorka's case was "always weak." *Id.* In the end, Dr. Skoorka was unsuccessful on all counts. *Id.* The Appellate Division affirmed the trial court's rulings, as well as the jury's verdict, in August 2011. *Id.*

### iii. 2006 EEOC complaint and federal court action

While his state court suit was pending, Dr. Skoorka filed a charge of discrimination with the EEOC on July 24, 2006. *Id.* On April 6, 2007, Dr. Skoorka brought an action in this federal court. *Id.* On March 20, 2009, the parties entered into a consent order wherein the judge dismissed Dr. Skoorka's case and granted him leave to refile his complaint within 120 days. *Id.* The order stipulated that if Dr. Skoorka refiled his complaint, the date of filing would relate back to April 6, 2007—i.e., the date he filed his federal lawsuit. *Id.*

### iv. 2009 DNJ and 2014 SDNY action

Near the end of that 120-day period, Dr. Skoorka refiled his complaint. *Id.* at *3. (I will call this the "2009 Action".) The 2009 Action attempted to

relitigate some of the matters on which Skoorka failed to prevail in the state court action. The 2009 complaint also incorporated the 2007 complaint's allegations, with the addition of a few incidents that had allegedly occurred in the interim. *Id.*

On June 27, 2014, Dr. Skoorka filed a complaint in the Southern District of New York (the "2014 Action"). *Id.* It virtually duplicated the allegations in the 2009 Action. (Skoorka later claimed that many of its allegations were fresh, or updated, and I afforded him the opportunity to replead.) Skoorka frankly acknowledged that he was forum-shopping because "to date, it has not been possible for Plaintiff to obtain a fair hearing of his claims against Defendants in New Jersey." (2014 Action ECF no. 11 at 21). The 2014 Action was transferred to this Court and consolidated with the 2009 Action. *Id.* (14-4561, ECF Nos. 39, 40). In essence, it was treated in this district as an update of the earlier allegations.

In a June 2, 2015 opinion, this Court granted summary judgment for defendants on the CEPA, NJLAD claims, and Title VII discrimination claims. *Skoorka*, 2015 WL 3533878, at *4. The union defendants were granted summary judgment in their favor. *Id.* I surveyed some 15 allegations, many of which had been updated since the filing of the 2009 complaint. Twelve, I found, were unsupported by any evidence. Three, I found, had at least minimal record support, and I discussed those three in light of the governing legal standards. The only claim to survive summary judgment was Dr. Skoorka's Title VII claim of retaliation as asserted against Kean. *Id.*

### B. This Action

Around February 16, 2015, Dr. Skoorka filed charges of discrimination and retaliation against defendants with the New York District Office of the EEOC. (Compl. ¶ 14). He amended or supplemented the EEOC charges around March 6, 2015, September 30, 2015, and January 19, 2016. (Compl. ¶ 14). He received a right-to-sue letter in March 2016. (Compl. ¶ 15). He then filed a complaint in the Southern District of New York, which was transferred to this

Court. (ECF Nos. 1-4). I will call this the "2016 Action." This opinion addresses defendants' motion to dismiss the transferred 2016 Action.[2]

## II.  ALLEGATIONS OF THE COMPLAINT

The complaint in this 2016 Action seems to raise or refer to allegations that have been discussed or dismissed in prior actions, and especially in my summary judgment opinion in the 2009 Action, *Skoorka v. Kean Univ.*, No. 9-cv-3428, 2015 WL 3533878 (D.N.J. June 2, 2015). It also contains some new or updated allegations. I survey the allegations here.

### A. Disability Policy

Dr. Skoorka claims that he was falsely accused of violating policies or practices regarding accommodations for students with disabilities. (Compl. ¶ 45). According to Dr. Skoorka, a student requested to use a tape recorder for notes but Dr. Skoorka recommended a note taker instead, apparently because his class uses visual aids. (Compl. ¶ 55). Dr. Skoorka filled out the "Student Disability Accommodation Form" for the student and wrote in "note taker." (Compl. ¶¶ 47-49). He alleges that "Kean suspiciously removed the note-taker option from the 'form' presented to Dr. Skoorka ... to set Dr. Skoorka up for a false accusation" of "denying a disability accommodation for a student and altering a form." (Compl. ¶¶ 47-49). Defendant Farahi sent Dr. Skoorka a letter about this matter around January 19, 2015 and placed the letter in Dr. Skoorka's personnel file. (Compl. ¶ 52). Dr. Farahi's letter stated that Dr. Skoorka's actions were "inappropriate" but did "not constitute a violation of the State Policy." (Compl. ¶ 53). The letter stated that "the information available revealed concerns about your professionalism, i.e., demeanor, collegial conduct, etc. in your interactions with students" and thus "this matter will be

---

[2]     Dr. Skoorka, seeking new forums for similar allegations, has also filed a duplicative action in the New York state courts and in the Eastern District of New York. The latter action was transferred here. Civ. No. 17-5484 (D.N.J.). *See* 2009 ECF no. 271, 2016 Action ECF no. 38 (summarizing procedural history in greater detail).

referred to the Office of Human Resources for appropriate action." (Compl. ¶ 53). No further action is alleged.

## B. Office Hours and Administrative Policies

Dr. Skoorka alleges that he was falsely accused of failing to comply with office-hours and other administrative policies. (Compl. ¶¶ 56-74). Kean stated that Dr. Skoorka failed "to update [his] office hours for the Fall 2014 semester" and requested a meeting to discuss that issue and "other administrative matters such as your general lack of responsiveness." (Compl. ¶ 59). Kean allegedly threatened Dr. Skoorka if he failed to attend such meeting. (Compl. ¶ 59). On October 23, 2014, Dr. Skoorka filed rebuttals stating that he had done nothing wrong. (Compl. ¶ 60). He claims that he has kept regular office hours; uses his personal email address because Kean failed to provide him with a working computer and appropriate access to Kean email; has provided his course syllabi to all students; does not submit a never-attended report because it is unnecessary and creates other problems; and does not check his voicemail because Kean has not provided him with a working phone. (Compl. ¶ 65).

Dr. Skoorka admits that he did not submit a self-assessment review report that was required for his faculty review. (Compl. ¶ 65). According to Skoorka, "given the ongoing unlawful conduct against me and ongoing litigations, it would be impossible for me to receive an unbiased [faculty] review." (Compl. ¶ 65).

Dr. Skoorka alleges that many non-Jewish faculty members used non-Kean email addresses, failed to post office hours, and failed to keep regular office hours. (Compl. ¶ 66-67). These faculty members were allegedly not subject to adverse actions. (Compl. ¶¶ 66-67). Skoorka claims that Dr. Kempey, who is not Jewish, was granted deferral of faculty evaluation because of Skoorka's litigation with Kean. (Compl. ¶ 72).

## C. Teaching Duties

Dr. Skoorka claims that Kean stripped him of his teaching duties in January 2015. (Compl. ¶ 75). On or about December 26, 2014, Kean requested that Dr. Skoorka attend "professional development days" alongside his colleagues. (Compl. ¶ 77). Dr. Skoorka requested a waiver and received one; he did not attend the program. (Compl. ¶¶ 78-79). The day after the program, Kean reassigned Dr. Skoorka to "professional development and nonteaching assignment for the Spring 2015 semester" and requested a meeting. (Compl. ¶ 82). Kean relied on Skoorka's absence from the professional development program as the basis for removing him from teaching duties. (Compl. ¶ 86). Dr. Skoorka alleges that the program was "sparsely attended" and that "[n]o one" in his department attended. (Compl. ¶ 87). Dr. Skoorka claims that he was entitled to teach every semester and his union's collective bargaining agreement did not permit such nonteaching duty. (Compl. ¶ 88).

Kean set up a meeting with Dr. Skoorka on January 21, 2015 to discuss the situation. (Compl. 89). Dr. Skoorka's union told Dr. Skoorka and Kean that a union representative was entitled to attend the meeting. (Compl. ¶ 92). Kean said "this is a work assignment" meeting, not an "employment meeting," and that therefore the union representative could not attend. (Compl. ¶ 92). Dr. Skoorka claims that the union should have filed a grievance. (Compl. ¶ 93). Kean also did not allow Dr. Skoorka to bring a court reporter to the meeting. (Compl. ¶ 92).

At the meeting, defendant Bousquet and Kean stated that Dr. Skoorka did not post his course syllabi, did not use a Kean email address, and had not filed a faculty report. (Compl. ¶ 94). Dr. Skoorka claims these accusations were "frivolous" and "petty," and that his actions did not violate the collective bargaining agreement or the law. (Compl. ¶ 95).

Dr. Skoorka remained on a nonteaching assignment for the Spring 2015 semester. (Compl. ¶ 98). He was required to work five days per week on campus from 9am to 5pm; he also had to sign in and out each day. (Compl.

¶ 98). Defendant Bousquet stated that Dr. Skoorka needed to revamp the "old" course outlines, that he would be required to give two guest lectures in other faculty's classes, and that the assignment was not given on a "punitive" basis. (Compl. ¶ 99). Dr. Skoorka maintains that other faculty members are not required to work more than four days a week on campus, and that these assignments conflicted with him teaching at NYU on Thursdays and observing the Sabbath on Fridays. (Compl. ¶ 102). He claims that his collective bargaining agreement requires one semester's advance notice to reassign a faculty member, which he did not receive. (Compl. ¶¶ 103-04). Additionally, Dr. Skoorka was required to submit timesheets while other faculty members were not; this, he says, was prohibited by the union collective bargaining agreement. (Compl. ¶ 105). Several months later, Kean raised the issue of timesheets on a faculty-wide basis. The union stated that this was prohibited for tenured faculty members. (Compl. ¶ 106).

Dr. Skoorka alleges that he was very popular with students and had a significant number of registrations for his spring 2015 classes. (Compl. ¶¶ 115-16). Students told Dr. Skoorka that they filed a petition on his behalf when they learned he was not teaching that semester. (Compl. ¶ 119).

### D. NYU Teaching Position

Dr. Skoorka had been teaching at NYU as an adjunct faculty member since around 1988/89. (Compl. ¶ 121). Kean's requirement that Dr. Skoorka work on campus from 9am to 5pm on Thursdays prevented him from maintaining his employment at NYU. (Compl. ¶ 122). (Previously, Skoorka claimed that he taught at NYU only at night. *Skoorka*, 2015 WL 3533878 at *17. The discrepancy is unexplained.) In February 2015, Kean accused Dr. Skoorka of non-compliance with state ethics requirements for failing to file a questionnaire regarding his teaching capacities as an NYU adjunct. (Compl. ¶ 148). Dr. Skoorka completed an online training on ethics in February 2015 and again in May 2015. (Compl. ¶¶ 157-60).

According to Dr. Skoorka, Kean faculty members regularly hold outside employment. (Compl. ¶¶ 123, 151-54). He states that Dr. Kempey held outside employment with the "New Jersey Council on Economics Education" and was given "release time" (i.e., he was excused from teaching six credits of courses) because of that position. (Compl. ¶ 152).

### E. Keanwise System

Around January 30, 2015, Kean removed Dr. Skoorka's class rosters and teaching schedules, including archives from previous semesters, from Keanwise—i.e., Kean's online system. (Compl. ¶ 146). Presumably this was in connection with his being relieved of teaching duties.

### F. Grievance Process and Assignments

Kean did not process Dr. Skoorka's grievance regarding his nonteaching assignment. (Compl. ¶ 124). On January 21, 2015, Dr. Skoorka requested that the union intervene. (Compl. ¶ 125). Dr. Skoorka sent the union a detailed memorandum on January 25, 2015. (Compl. ¶ 126). On or about January 30, 2015, the union, at Dr. Skoorka's insistence, filed four grievances on his behalf. (Compl. ¶ 127). Under the collective bargaining agreement, Kean was required to address the grievances within twenty days—i.e., by February 19, 2015. (Compl. ¶ 127).

Kean offered to hold a hearing on April 2, 2015. (Compl. ¶ 132). Dr. Skoorka wanted to return to the classroom during the spring semester and felt that this hearing date was too late; he objected to Kean's offer. (Compl. ¶¶ 133-34). Thursday, April 2, 2015, was also a date that Dr. Skoorka was scheduled to teach at NYU, and it fell just before the Jewish holiday of Passover. (Compl. ¶¶ 135-36).[3]

The union allegedly failed to take action regarding the date of the hearing. (Compl. ¶ 138). James Castiglione, a union leader, told Dr. Skoorka

---

[3]      In 2015, Passover began at sunset on Friday, April 3. That date, as it happens, was also the Good Friday holiday on the Western Christian calendar.

that he should dismiss his lawsuit against the union and "sign a membership card." (Compl. ¶ 138). Dr. Skoorka alleges that the union ultimately did not "aggressively and faithfully" pursue his claims. (Compl. ¶ 139).

Dr. Skoorka did not attend the April 2, 2015 grievance meeting. (Compl. ¶ 144). The union, because Dr. Skoorka missed this meeting, then withdrew his grievances. (Compl. ¶ 145).

During the spring 2015 semester, Dr. Skoorka performed the work requested by Kean. (Compl. ¶¶ 161-66). This included updating six course outlines. (Compl. ¶¶ 163-64). Dr. Skoorka attended professional development programs at Kean in May and June 2015. (Compl. ¶ 168). He then submitted memos to the university demanding that he be returned to teaching assignments. (Compl. ¶ 169).

On May 28, 2015, the union issued a directive that Kean was not permitted to require full-time tenured faculty members to work a 35-hour week, to sign in and out of work, and fill out time sheets. (Compl. ¶ 173).

Dr. Skoorka's nonteaching status continued through the fall 2015 semester. (Compl. ¶¶ 176-80). According to Dr. Skoorka, the collective bargaining agreement requires Kean to give 30 days' advance notice of reassignment of duty. (Compl. ¶ 182). Kean did not give Dr. Skoorka advance notice of this action. (Compl. ¶ 182).

Kean sent Dr. Skoorka correspondence seeking to schedule a meeting for September 15, 2015, which fell during the Jewish holiday of Rosh Hashanah.[4] (Compl. ¶ 185). Kean also attempted to hand deliver correspondence to Dr. Skoorka on a Friday between 3pm and 4pm. (Compl. ¶ 187). (Dr. Skoorka, who says he lives several miles from campus, would leave early on Fridays to observe the Sabbath. (Compl. ¶ 187).) Kean also sent correspondence, which

---

[4]     In 2015, Rosh Hashanah ran from sunset on Sunday, September 13 until nightfall on Tuesday, September 15.

required a signature, to Dr. Skoorka on the Jewish holiday of Yom Kippur, when he was at Temple and not at home. (Compl. ¶ 189).

Kean sent Dr. Skoorka a letter on September 21, 2015, alleging that he had failed to comply with his scheduled office hours and requiring him to attend a "disciplinary interview." (Compl. ¶ 186). Dr. Skoorka asserts that office hours "are [only] for faculty with a teaching schedule," and that he was not teaching at that time. (Compl. ¶ 186). Kean allegedly attempted to have Dr. Skoorka attend the disciplinary meeting without representation. (Compl. ¶ 188).

### G. Car Vandalism and Parking

From around 1998 to 2004, Dr. Skoorka's car was repeatedly vandalized at Kean. (Compl. ¶ 192). He alleges that Kean and/or the union perpetrated this vandalism, which included anti-Semitic graffiti on it, destruction of his tires, and spitting on his car. (Compl. ¶ 192). The Kean police did not take remedial action, refused to take fingerprints, and wiped clean a knife that had been inserted into tires, thus leading to the spoliation of evidence. (Compl. ¶ 193). Dr. Skoorka thus cannot park at Kean and must commute by walking several miles. (Compl. ¶ 194).

### H. Police Harassment, Alleged Harassment, and Surveillance

Dr. Skoorka alleges that he has received "at least two separate death threats" in the form of dead animals placed on his property. Each incident allegedly occurred soon after Dr. Skoorka engaged in activities against Kean or the union. (Compl. ¶ 196). The police also allegedly kept Dr. Skoorka under surveillance. (Compl. ¶ 197). Dr. Kempey, who was the department chairperson from 1990 to 2008, repeatedly disrupted Dr. Skoorka's classes and "embarrass[ed]" him in front of his students. (Compl. ¶¶ 24, 198).

Dr. Skoorka claims that the Kean police harassed him on several occasions. (Compl. ¶ 199). In one incident, several police officers surrounded him, detained him, and accused him of being a drug dealer. (Compl. ¶ 200). In another incident, the police surrounded him, detained him, and demanded his

identification. (Compl. ¶ 201). Dr. Skoorka complained to the Director of Public safety, who said that Dr. Skoorka had been acting "suspiciously," taking photographs on campus, and that "calls" had been received about him. (Compl. ¶ 202). Dr. Skoorka stated that he was taking pictures of persons who were photographing him; he claims he was under surveillance. (Compl. ¶¶ 201-02). The Director promised to make the police stop, stating words to the effect of "now that I know who you are I can let the police know who you are." (Compl. ¶ 204). Dr. Skoorka's interactions with the police continued. (Compl. ¶ 204). Dr. Skoorka asked the Kean police to produce their records, but they have not consented. (Compl. ¶ 208). Dr. Skoorka claims that individuals outside of his protected class have not experienced similar treatment. (Compl. ¶ 209).

### I. Failure to Promote

Dr. Skoorka also claims that Kean repeatedly has denied him a promotion and has continued to promote or hire less-qualified persons, outside of his protected religious or ethnic class, to Associate Professor and Full Professor. (Compl. ¶ 210). Dr. Skoorka claims that it is standard practice to promote an Assistant Professor to Associate Professor when tenure is granted. (Compl. ¶ 211).

### J. Accommodations and Supplies

Dr. Skoorka claims that Kean failed to provide him with necessary accommodations, including a computer (which he received in February 2015), office supplies and equipment. The university, he says, continues to vandalize the resources that are provided to him. (Compl. ¶ 213).

### K. Claims

Dr. Skoorka claims that the defendants' conduct has resulted in damage to his good name and reputation, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, lasting embarrassment and humiliation, and cluster headaches. (Compl. ¶¶ 233-34). For this, he seeks damages and any other appropriate relief. (Compl. ¶ 236). He asserts six numbered counts against various defendants:

- Count 1 is a Title VII claim against defendants Kean University, the State of New Jersey, the Board, KFT, the Council, and AFT. Dr. Skoorka alleges that he has been subject to adverse employment practices and unlawful discrimination on the basis of his religion and creed. (Compl. ¶¶ 237-46).

- Count 2 is a New Jersey Conscientious Employee Protection Act ("CEPA") claim against all defendants. Dr. Skoorka alleges that he disclosed or threatened to disclose policies or practices of defendants that he reasonably believes violate laws, rules or regulations; defendants have allegedly retaliated against him on this basis. (Compl. ¶¶ 247-59).

- Count 3 is a New Jersey Law Against Discrimination ("NJLAD") claim against all defendants. Dr. Skoorka claims that defendants discriminated against him and harassed him on the basis of his religion and creed. (Compl. ¶¶ 260-76).

- Count 4 is a NJLAD claim against all defendants. Dr. Skoorka claims that defendants have retaliated against him for protected activities. (Compl. ¶¶ 277-90).

- Count 5 is a New York City Human Rights Law ("NYCHRL") claim against all defendants. Dr. Skoorka claims that defendants discriminated against him, subjected him to adverse employment practices, and retaliated against him for protected activities. (Compl. ¶¶ 291-302).

- Count 6 is a New York State Human Rights Law ("NYSHRL") claim against all defendants. Dr. Skoorka claims that defendants discriminated against him, subjected him to adverse employment practices, and retaliated against him for protected activities. (Compl. ¶¶ 303-13).[5]

Now before the Court are defendants' motion to dismiss the complaint. (ECF Nos. 8, 9).

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all

---

[5]     Counts 5 and 6, the New York law claims, were originally asserted in the Southern District of New York. Venue of that action, however, was transferred here.

allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' … it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

The United States Court of Appeals for the Third Circuit has explicated the *Twombly/Iqbal* standard on several occasions. *See, e.g., Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 70-73 (3d Cir. 2011); *Santiago v. Warminster Twp.*, 629 F.3d 121, 129-30 (3d Cir. 2010). In doing so, it has provided a three-step process for evaluating a Rule 12(b)(6) motion:

> To determine whether a complaint meets the pleading standard, our analysis unfolds in three steps. First, we outline the elements a plaintiff must plead to a state a claim for relief. *See [Iqbal*, 556 U.S.] at 675; *Argueta*, 643 F.3d at 73. Next, we peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 679; *Argueta*, 643 F.3d at 73. Finally, we look for well-pled factual allegations, assume their veracity, and then "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S.

at 679; *Argueta*, 643 F.3d at 73. This last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

*Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also In re Asbestos Prods. Liability Litig. (No. VI)*, 822 F.3d 125, 134 & n.7 (3d Cir. 2016); *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case.").

## IV.    DISCUSSION

In many (though not all) respects, the disposition of claims here parallels that in the earlier summary judgment opinion in the 2009 Action. Section III.A addresses Dr. Skoorka's CEPA claims, which are dismissed as untimely under the statute of limitations. Section III.B. discusses his updated Title VII retaliation claims, which survive this motion to dismiss. Section III.C addresses his NJLAD retaliation claims, which are dismissed on grounds of waiver. Section III.D addresses his Title VII and NJLAD harassment and discrimination claims, which are dismissed for failure to state a claim. Finally, Section III.E addresses his NYCHRL and NYSHRL claims, which are dismissed for failure to state a claim.

### A. CEPA Claims

CEPA, New Jersey's Conscientious Employee Protection Act, was enacted to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003) (citing *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994)). A plaintiff who brings a cause of action under CEPA must demonstrate that (1) he or she reasonably believes that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in [CEPA]; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Id.*

#### i. Protected activity

Dr. Skoorka has pled that he had a reasonable belief that defendants' conduct violated a law, rule, regulation, or clear mandate of public policy. "A plaintiff who brings a claim pursuant to [CEPA] need not show that his or her employer or another employee actually violated the law or a clear mandate of public policy.... Instead, the plaintiff simply must show that he or she reasonably believes that to be the case." *Dzwonar*, 828 A.2d at 900 (internal quotation marks omitted). Dr. Skoorka points to internal complaints of discrimination, harassment, and retaliation; an EEOC charge he filed in January 2014; and several lawsuits he has filed against defendants. (Compl. ¶¶ 30-44). He has alleged a belief that defendants violated anti-discrimination and harassment laws.

#### ii. Adverse employment action

To constitute a retaliatory action under CEPA, the employer's conduct must attain a certain level of severity. CEPA defines a "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of

employment." N.J. Stat. Ann. § 34:19-2(e). Many courts have held that the employer's action must either affect the employee's compensation or rank, or be "virtually equivalent to discharge." *See Klein v. Univ. of Med. & Dentistry of New Jersey*, 871 A.2d 681, 691 (N.J. Super. Ct. App. Div. 2005). Other courts, however, have taken a somewhat broader view. Examples of retaliatory conduct have included suspensions, demotions, changes to the length of the workday, changes in salary, hours, fringe benefits, or "physical arrangements and facilities," and altered "promotional procedures." *Beasley v. Passaic County*, 873 A.2d 673, 685-86 (N.J. Super. Ct. App. Div. 2005); *see also Smith v. Twp. of E. Greenwich*, 519 F. Supp. 2d 493, 511 (D.N.J. 2007), *aff'd*, 344 F. App'x 740 (3d Cir. 2009). A series of minor actions may, in the aggregate, amount to a pattern of retaliatory conduct. *See Green v. Jersey City Bd. of Educ.*, 828 A.2d 883, 891 (N.J. 2003).

Dr. Skoorka has alleged multiple incidents that he says constitute retaliatory conduct. He does not, however, plead any actions that rise to the level of adverse employment action under CEPA *within CEPA's one-year statute of limitations. See* N.J. Stat. Ann. § 34:19-5 ("Upon a violation of any of the provisions of this act, an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction."). Dr. Skoorka filed this action on June 2, 2016. Therefore, to be timely, any claim under CEPA must have arisen on June 2, 2015 or later.

Some of Dr. Skoorka's allegations—such as those involving the rodents, failure to promote, and car vandalism—were disposed of in my prior summary judgment opinion. They also fall far outside the statute of limitations.

The 2016 Complaint adds certain allegations dating from early 2015, which come closer, but are still time-barred. Dr. Skoorka was removed from his teaching responsibilities and given other duties starting on January 7, 2015. The related "denial of access" to the Keanwise database occurred in January 2015. The complaints about "policy violations regarding outside activities" occurred no later than February 2015. His complaint about a letter regarding

his response to a student with disabilities arose in January 2015. These actions, even assuming they rise to the level of severity required under CEPA (which is not at all clear), arose before June 2, 2015, and therefore do not fall within the one-year limitations period.

Because Dr. Skoorka fails to plead an adverse employment action within CEPA's statute of limitations, his CEPA claim will be dismissed.

### B. Title VII Retaliation Claims

As a preliminary matter, it is important to note three distinctions between retaliation claims under Title VII and CEPA. First, individual defendants are not "employers" subject to liability under Title VII. *See Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996). Therefore, as pointed out in the prior summary judgment opinion, *Skoorka v. Kean Univ.*, No. 9-cv-3428, 2015 WL 3533878, at *19 (D.N.J. June 2, 2015), Title VII retaliation claims cannot be asserted against the individual defendants.

Second, while a CEPA retaliation claim may be based on an employee's report of a wide variety of unlawful practices, a Title VII retaliation claim must be based on an employee's report of a violation of Title VII itself. 42 U.S.C. § 2000e-3(a). Dr. Skoora's claim of retaliation, then, may be based on his complaints of religious discrimination only.

Third, Title VII's definition of retaliatory action is broader than that of CEPA. A particular act might be actionable under Title VII even if it does not rise to the level of retaliation under CEPA. *See Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Skoorka v. Kean Univ.*, No. 9-3428, 2015 WL 3533878, at *20 (D.N.J. June 2, 2015).

To establish a prima facie case of retaliation under Title VII, Dr. Skoorka must establish that (1) he engaged in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006). Dr. Skoorka's complaints to superiors about discriminatory

treatment, lawsuits, and EEOC filings qualify as activities protected by Title VII. *See id.* at 343.

### i. Adverse employment action

As stated above, Title VII's definition of adverse employment action is broader than CEPA's definition. For a Title VII retaliation claim,

> a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.
>
> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace. An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (internal quotations and citation omitted).

Dr. Skoorka has alleged that Kean transferred him from a teaching position to a nonteaching position. This is severe enough to qualify as a potential retaliatory action for purposes of a Title VII claim against Kean.

### ii. Causal connection

Dr. Skoorka has pled sufficient facts which, if supported by evidence, could support an inference of causal connection between his complaints of discrimination and the potential retaliatory action.

> To establish causation at the prima facie stage, a plaintiff must introduce evidence about the "scope and nature of conduct and circumstances that could support the inference" of a causal connection between the protected activity and adverse action. At this stage, "a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between [the] protected activity and the adverse action taken." For example, very close temporal proximity between the adverse action and the protected activity may be "unusually suggestive" of a causal connection. A plaintiff can also

rely on evidence such as "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus."

*Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 95-96 (3d Cir. 2016) (internal citations omitted). Dr. Skoorka has alleged that Kean articulated inconsistent reasons for giving him a nonteaching assignment. He was allegedly told he was given the nonteaching assignment because he had a particular expertise, and that the reassignment was not punitive. (Compl. ¶ 99). He was also allegedly told that the assignment was based on his failure to attend professional development sessions and to complete certain administrative tasks (such as posting course syllabi, using a Kean email address, and submitting a Faculty Activity Report). (Compl. ¶¶ 86, 94). As an allegation, that is sufficient.

### iii. Union defendants

Dr. Skoorka alleges that the union defendants should have, but did not, press his grievances against Kean. A union might be liable under Title VII if it makes a deliberate choice not to process an employee's grievance. *See Barrentine v. New Jersey Transit*, 44 F. Supp. 3d 530, 540 n.8 (D.N.J. 2014) (McNulty, J., in dicta). Such a claim would be based on the union's duty of fair representation. *See, e.g., Vaca v. Sipes*, 386 U.S. 171, 176-77 (1967). Assuming such a claim is legally viable, Dr. Skoorka has pled sufficient facts stating that the union defendants chose not to press his grievances against Kean. Dr. Skoorka has alleged that the union did not try to move his hearing date earlier (to comply with a timeline allegedly set forth in the collective bargaining agreement) and withdrew his grievance against Kean (allegedly because he did not attend the originally scheduled hearing).

We are, of course, at the motion to dismiss stage with respect to these particular allegations. Whether such allegations can be sustained in light of the evidence, whether the union or the university had sufficient reason for acting as they did, and so forth, cannot be decided here. As in the case of the earlier

allegations in the 2009 action, they may or may not survive summary judgment. For now, however, the motion to dismiss is denied as to Dr. Skoorka's Title VII retaliation claim against the Kean and union defendants.

### C. NJLAD Retaliation Claims

As stated in my earlier summary judgment opinion, a claim of retaliation under CEPA waives any state law claim that is "substantially related," i.e., in the sense of requiring the same proofs. *Skoorka v. Kean Univ.*, No. 9-cv-3428, 2015 WL 3533878, at *13-14 (D.N.J. June 2, 2015). Dr. Skoorka cannot assert both a CEPA retaliation claim and an NJLAD retaliation claim. I therefore dismiss his NJLAD retaliation claim.

### D. Title VII and NJLAD Harassment and Discrimination Claims

Dr. Skoorka claims that defendants discriminated against him because of his Jewish religion or ethnic background. A prima facie case of disparate treatment or hostile work environment, whether under the NJLAD or Title VII, requires two essential showings. The plaintiff must (1) show an adverse employment action and must (2) point to evidence that the action was taken for an unlawful, discriminatory reason. *See Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *William Paterson Coll. of New Jersey*, 260 F.3d 265, 282 n.13 (3d Cir. 2001); *Maddox v. City of Newark*, 50 F. Supp. 3d 606, 627 (D.N.J. 2014) (citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 453-54 (N.J. 1993)).

Dr. Skoorka alleges that he was transferred to a less desirable assignment (i.e., a nonteaching position), which I will assume to be severe enough to constitute an adverse employment action. *See Scott v. New Jersey*, 143 F. App'x 443, 446-47 (3d Cir. 2005) (stating that transfers involving a reduction in status may be adverse employment actions). Dr. Skoorka also raises several incidents or issues that would not rise to the level of adverse employment actions.

Where the claim falls short is in its failure to state facts giving rise to an inference of discrimination based on Dr. Skoorka's religion or ethnic

background. It is not enough simply to recite workplace grievances and state the ethnic backgrounds of the participants.

Reading the complaint very liberally and construing inferences in his favor, I can still find only a few allegations specific to membership in a protected class: **(i)** Dr. Skoorka was told to submit a self-evaluation form (that all professors were required to submit), even though a non-Jewish professor was granted a deferral; **(ii)** Dr. Skoorka was told to use a Kean email address, even though a non-Jewish professor used a non-Kean email address; **(iii)** Kean scheduled a meeting with Dr. Skoorka on April 2, 2015, even though this date fell one day before the Jewish holiday of Passover; **(iv)** Kean did not accommodate his teaching duties at NYU, even though a non-Jewish professor received "release time" to work with the New Jersey Council on Economics Education ("NJCEE"); **(v)** Kean sought to schedule a meeting with him on September 15, 2015, the last day of the Jewish holiday of Rosh Hashanah; **(vi)** Kean attempted to hand deliver correspondence to Dr. Skoorka on a Friday between 3pm and 4pm even though Dr. Skoorka leaves early on Friday to observe the Sabbath; **(vii)** Kean sent Dr. Skoorka correspondence that arrived on September 23, 2015, and required a signature, on the Jewish holiday of Yom Kippur; **(viii)** from 1998 to 2004, Kean and/or the union allegedly vandalized Dr. Skoorka's car, including with anti-Semitic graffiti; **(ix)** a non-Jewish professor repeatedly interrupted Skoorka's classes, embarrassing him in front of students; **(x)** Kean has promoted allegedly less-qualified non-Jewish individuals while failing to promote him. (Compl. ¶¶ 97, 136, 152-54, 175, 185, 187, 189, 198, 212).

**(i)** Dr. Skoorka claims that Kean told him to submit a self-evaluation form. He alleges that Dr. Kempey, a non-Jewish faculty member, received a deferment for submitting the evaluation form because of Dr. Skoorka's ongoing litigation. The situations as alleged are not comparable. Skoorka admits that he was asked to submit a routine self-evaluation form and decided on his own not to submit it. Dr. Kempey apparently sought a delay in submitting the form and

22

was granted it. Dr. Skoorka states that he refused to fill out the form and later requested a deferral; he does not even state whether that request was denied, or whether there were any repercussions. Because Dr. Skoorka fails to allege differential treatment in a factually similar circumstance or any significant consequences, this incident does not give rise to a claim or inference of religious discrimination.

(ii) Dr. Skoorka claims that Kean's insistence that he use a Kean email address was "patently discriminatory" because at least one non-Jewish faculty member allegedly uses a non-Kean email address. (Compl. ¶ 97). The complaint does not plead sufficient facts showing that Kean accepts the other professor's use of a non-Kean email address. In fact, as far as the record shows, Dr. Skoorka himself continues to use a non-Kean email address. There is no inherent connection to religion and the facts do not suggest that religious-based discrimination animated any purported differential treatment. This alone cannot support an inference of religious-based discrimination.

(iii), (v), (vi), (viii) Dr. Skoorka alleges four instances where Kean has either scheduled meetings or sent him correspondence on or near Jewish holidays. Dr. Skoorka does not allege that he requested the meetings be moved to another time. He does not state that defendants refused to meet on a different day. Regarding the correspondence, there are no facts to suggest that Dr. Skoorka suffered any adverse consequence for not responding to correspondence, even assuming that it was delivered on or near a day of religious observance. He does not state that he was required to discharge any official responsibility in conflict with religious holidays or observances. These incidents do not show adverse employment actions or harassment, nor do they suggest an inference of religious-based discrimination.

(iv) Dr. Skoorka claims that Kean discriminated against him by failing to accommodate his adjunct teaching schedule at NYU. Similar allegations were dealt with in my prior summary judgment opinion. Dr. Skoorka alleges that Dr. Kempey, who is not Jewish, was given "release time" (i.e., time off from

23

teaching classes) to serve on the New Jersey Council on Economics Education ("NJCEE").[6] This is not a suggestive comparison. A state university might accommodate an economics professor working with a publicly minded organization developing economics literacy in K-12 students in the state, while declining to accommodate another professor's desire to supplement his income by moonlighting at another university. In short, Kean was not required to place NYU's scheduling needs above its own. These situations, which do not have any inherent religious dimension, are not comparable and do not give rise to an inference of inequitable or disparate treatment because of religion.

(viii) Dr. Skoorka alleges that Kean and/or the union vandalized his car, including with anti-Semitic graffiti, from 1998 to 2004. These claims have already been raised in earlier complaints and are well beyond the statute of limitations. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (holding that a Title VII plaintiff raising claims of discrete acts must file his charge within the 300-day statute of limitations); *Brown v. R.R. Grp. LLC*, No. 16-cv-4602, 2017 WL 1365215, at *1 (D.N.J. Apr. 7, 2017) (stating that NJLAD has a two-year statute of limitations). Therefore, any claims based on vandalism to Mr. Skoorka's car are dismissed.

(ix) Dr. Skoorka alleges that Dr. Kempey, who was the Department chairperson from 1990 to 2008 and is not Jewish, repeatedly disrupted his classes and embarrassed him in front of students. (Compl. ¶¶ 24, 198). Dr. Skoorka allegedly photographed Dr. Kempey to document these incidents. (Compl. ¶ 198). Dr. Skoorka does not provide any further facts about these interactions. Even liberally interpreting this as a hostile-work-environment

---

[6]     A quick web search turns up the "New Jersey Council for Economic Education," which seems to be the current name of that organization. https://njeconomics.org/

Mr. Skoorka also makes claims regarding other faculty members but does not specify that these faculty members are not members of the protected class. (*See, e.g.*, Compl. ¶¶ 151, 153). These statements also do not support an inference of religious discrimination.

claim, Dr. Skoorka fails to state any connection between this harassment and his religion or ethnicity.

In addition, these seem to be the same allegations sustained in my prior 2009 Action summary judgment opinion. As asserted here, they are also redundant and would be dismissed (even on the assumption that they would be asserted timely in the current action).

(x) Dr. Skoorka alleges that Kean has wrongfully failed to promote him, while promoting less-qualified non-Jewish professors. My previous summary judgment opinion rejected his claim that Kean wrongfully failed to promote him. *Skoorka v. Kean Univ.*, No. 9-cv-3428, 2015 WL 3533878, at *8-9 (D.N.J. June 2, 2015). Dr. Skoorka does not state that he has applied for a promotion at any time after 2002. Rather, he alleges that he has a "standing" application—although he acknowledges that the university has no provision for such a "standing" application. *Skoorka v. Kean Univ.*, No. 9-cv-3428, 2017 WL 2838459, at *8 (D.N.J. June 30, 2017). A denial of promotion is a discrete action; it does not constitute a "continuing" violation. *Id.* Dr. Skoorka seeks to relitigate claims that have already been decided and are beyond the statute of limitations. Claims in the complaint, to the extent they are based on failure to promote, are dismissed.

More generally, Dr. Skoorka points to no other evidence—not so much as a stray derogatory remark—in support of his religious-discrimination claim. He simply recites workplace frustrations and attributes them to his religion. Dr. Skoorka's NJLAD and Title VII claims for discrimination and harassment are therefore dismissed.

### E. NYCHRL and NYSHRL Claims

Finally, counts 5 and 6 of the complaint assert claims under the NYCHRL and the NYSHRL. To determine whether the laws of New Jersey or New York (City or State) apply, this court must conduct a choice-of-law analysis. "[A] federal court whose jurisdiction over a state claim is based ... on pendency to a federal claim ... must apply the conflicts of law principles of the

forum state." *Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 429 (3d Cir. 1982).[7] This court sits in New Jersey and "New Jersey courts have consistently applied the law of the state of employment to workplace claims." *Satz v. Taipina*, No. 1-cv-5921, 2003 WL 22207205, at *16 (D.N.J. Apr. 15, 2003), *aff'd* 122 F. App'x 599 (Table) (3d Cir. 2005). New Jersey courts have applied Pennsylvania law when New Jersey residents have worked exclusively in Pennsylvania—and New York law when New Jersey residents have worked exclusively in New York. *Id.* If a New Jersey resident works exclusively in New Jersey, the NJLAD thus applies. *Id.* Dr. Skoorka worked for Kean exclusively in New Jersey and is a New Jersey resident; New Jersey law thus applies.[8]

---

[7]     Dr. Skoorka originally filed this action in New York. A change of venue is ordinarily "only a change of courtrooms and not a change of law, … so that after the transfer the same law is applied as would have been applied had the case remained in the transferor court." *See* 14D Wright & Miller, *Federal Practice & Procedure* § 3827 (4th ed. 2016). However, "whenever the original venue is improper, … the transferee court should apply whatever law it would have applied had the action been properly commenced there." *Id.* The New York court found that venue was improper. (2014 Action ECF no. 5 (also finding in the alternative that it would transfer venue on a discretionary basis)) This Court will therefore apply New Jersey choice-of-law rules.

[8]     Moreover, a conflict-of-laws analysis is unnecessary if the laws do not conflict. Neither party has suggested that the NJLAD, NYCHRL, or NYSHRL differ—i.e., that one is more expansive than another. *See Mirabella v. Oasis Foods Co.*, No. 12-cv-6218, 2014 WL 7272955, at *4-5 (D.N.J. Dec. 16, 2014). The New York anti-discrimination claims are simply a restatement of the New Jersey claims under New York law.

To inject a note of reality, this is Dr. Skoorka's second attempt to file his claims in the Southern District of New York out of dissatisfaction with the New Jersey federal and/or state courts:

The origin of the New York complaint is clear: Skoorka acknowledges that he went to New York because "to date, it has not been possible for Plaintiff to obtain a fair hearing of his claims against Defendants in New Jersey." (ECF no. 11 at 21). To all appearances, he simply refiled his New Jersey claims in New York, but declared them to be "recent" and "new" in response to the motions to dismiss. Nevertheless, the SDNY transferred venue back to New Jersey, and all of those claims are now in this Court. The motions are concerned with the effect that the claims in the First DNJ action should have upon this action. But the distribution of these claims across two separate actions is a procedural artifact. This is in fact a single, ongoing controversy between the same parties. The claims, if not identical (which remains to be seen) are at the very least closely

Therefore, Dr. Skoorka cannot assert claims under New York City or New York State law. His claims under the NYCHRL and the NYSHRL are dismissed.

## V.    CONCLUSION

As noted, the current allegations are evaluated under a forgiving, motion to dismiss standard. The Court is not unaware that Dr. Skoorka continues to reassert similar allegations in new actions, nor can it be blind to a history in which very few of his prior allegations were found to have even minimal evidentiary support. A fact finder may also be skeptical of a litigant's endless daisy chaining of "retaliation" claims, each time claiming that workplace grievances occurred in retaliation for prior, unsuccessful claims. That determination, however, is for another day.

For the foregoing reasons, defendants' motion to dismiss will be granted as to Count 2 (CEPA), Count 3 (NJLAD – discrimination), Count 4 (NJLAD – retaliation), Count 5 (NYCHRL), and Count 6 (NYSHRL). Count 1 (Title VII) is dismissed insofar as it claims discrimination and harassment.

The only surviving cause of action is a Title VII retaliation claim under Count 1. Part of this claim is against Kean University, its Board of Trustees, and the State of New Jersey. The remaining part, which is analogous to a breach of the duty of fair representation, is against the Kean Federation of

---

interrelated. I intend to resolve all claims against all parties, and will use my discretion to ensure that this occurs.

*Skoorka v. Kean Univ.*, No. 9-cv-3428, 2016 WL 775751, at *3 (D.N.J. Feb. 25, 2016) (internal citation omitted). This was forum-shopping, not law-shopping, and the New York district court was eminently justified in transferring venue back to this Court, where the claims arose and where litigation had been pending for years. I consolidated the two cases, dismissed the 2014 Action complaint as then pled, and permitted Skoorka to re-plead any facts or claims that had arisen since the disposition of his earlier claims on summary judgment. As noted, he only partially complied with that directive, including many old claims in his new pleading in the consolidated 2009/2014 case.

As noted above, there is also a duplicative action filed in the New York state courts, as well as one filed in the Eastern District of New York and subsequently transferred here. Civ. No. 17-5484 (D.N.J.). (*See* 2009 ECF no. 271, 2016 Action ECF no. 38 (summarizing procedural history in greater detail).

Teachers, Council of New Jersey State College Locals, and the American Federation of Teachers. All claims against all individual defendants—i.e., Farahi, Toney, Bousquet, Moskovitz, Green, Gresham, Howlett, Chowdhury, and Williams—are dismissed.

Dated: June 26, 2018

**KEVIN MCNULTY**
**United States District Judge**